IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RODNEY ALLEN SNYDER, | CASE NO. 3:25-cv-1219 |
| Plaintiff, | DISTRICT JUDGE JAMES R. KNEPP II |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Rodney Allen Snyder filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In August 2022, Snyder filed an application for disability insurance benefits, alleging a disability onset date of July 14, 2022.[1] Tr. 206. In his application, Snyder claimed disability due to Crohn's disease, ulcerative colitis,

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

heart issues, spinal osteoarthritis, depression, boils, and "some vision issues." Tr. 256. The Social Security Administration denied Snyder's application and his motion for reconsideration. Tr. 77, 88. Snyder then requested a hearing before an Administrative Law Judge (ALJ). Tr. 126.

In May 2024, an ALJ held a hearing, during which Snyder and a vocational expert testified. Tr. 35–65. That month, the ALJ issued a written decision finding that Snyder was not disabled. Tr. 21–30. The ALJ's decision became final on April 11, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Snyder filed this action on June 10, 2025. Doc. 1. He asserts the following assignment of error:

> Whether the ALJ's residual functional capacity finding is unsupported by substantial evidence. Whether the [ALJ] erred in her evaluation of the opinion and prior administrative medical findings when failing to comply with the revised regulations. Whether the ALJ failed to evaluate Plaintiff's subjective allegations pursuant to SSR 16-3p and 20 C.F.R. § 404.1529.

Doc. 11, at 1.

**Evidence**

*Personal and vocational evidence*

Snyder was 41 years old on his alleged disability onset date. Tr. 28. He completed eleventh grade and used to work as a forklift driver. Tr. 257.

2

*Relevant medical evidence*[2]

In April 2022, x-rays of Snyder's lumbar spine showed mild to moderate degenerative facet arthrosis involving L4-5 and L5-S1.[3] Tr. 348. X-rays of Snyder's cervical spine showed disc space narrowing at C5-6. Tr. 350.

In October 2022, Snyder went to the emergency room for neck pain and stiffness that began three days before his visit. Tr. 387. He reported some associated grip weakness that he had experienced for a year. Tr. 387. Snyder also said that moving his neck caused sharp chest pain. Tr. 387. An exam showed that Snyder had a normal range of motion in his cervical spine, a supple neck, and no weakness or problematic "upper motor neuron signs." Tr. 390. Cervical spine x-rays showed minimal disc space narrowing at C6-C7. Tr. 445.

About a week later, Snyder followed up with his gastroenterologist for Crohn's disease. Tr. 383. Snyder said that he was "doing fine lately." Tr. 383.

---

[2] Snyder's arguments relate to his spinal impairment and, to a lesser extent, his Crohn's disease and boils. So I only include facts related to these impairments.

[3] Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, [https://perma.cc/R9MM-TBZT]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id*. The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, [https://perma.cc/S2BR-RBTB].

He had experienced a small amount of painless bleeding. Tr. 383. The doctor told Snyder to start Metamucil and follow up if the bleeding continued. Tr. 385.

In November 2022, Snyder visited the Orthopedic Institute of Ohio. Tr. 923, 936. He complained of cervical pain, hand numbness, cold sensation, and difficulty opening jars. Tr. 936. Snyder also reported lower back and right hip pain. Tr. 936. Snyder's upper extremity exam showed cold hands, intact sensation, and "5/5 grip strength, finger extension, wrist extension, elbow flexion, elbow extension, and shoulder abduction." Tr. 937. Snyder's lower extremity exam showed full strength and intact sensation. Tr. 937. Snyder had no tenderness in his spine. Tr. 937. The provider ordered physical therapy for Snyder's cervical and lumbar spine. Tr. 938.

In December 2022, Snyder went to the emergency room for scrotal abscesses. Tr. 370. He reported that his Crohn's disease "was doing quite well." Tr. 370. A CT scan of his pelvis showed marked sacroiliac joint degenerative changes. Tr. 967.

That month, Snyder started physical therapy. Tr. 377–78. Snyder reported that he needed assistance doing dishes, mopping, sweeping, carrying groceries, bending, and lifting. Tr. 378. He rated his pain a "4/10," and explained that his left-sided neck pain radiated into his left shoulder and his lower back pain radiated to his left hip. Tr. 379. On exam, Snyder had slightly decreased strength (4 or "4+" out of 5) in his lower extremities but retained strength that was within functional limitations. Tr. 380. He had slightly

4

decreased strength in his left shoulder, but his range of motion was within functional limitations. Tr. 379.

In January 2023, Snyder followed up with his orthopedic provider. Tr. 933. Snyder reported that he completed four physical therapy sessions but stopped attending because he developed an infection. Tr. 575, 933. Snyder said that, during the three weeks before his appointment, he experienced worsening cervical and left shoulder pain. Tr. 933. He also complained of worsening weakness in his left upper extremity. Tr. 933. On exam, Snyder had "4/5" weakness in his left upper extremity (grip testing, elbow flexion, and shoulder adduction) compared to "5/5" in his right. Tr. 934. The provider ordered a cervical spine MRI, which showed large bone spurs at C5-6 with severe spinal stenosis and cervical cord flattening. Tr. 939. The provider indicated that Snyder "would be a candidate for some type of decompressive surgery." Tr. 940.

In May 2023, Snyder saw B.T. Onamusi, M.D., for a consultative exam. Tr. 625–33. Snyder detailed his medical history, including that his surgeon had recommended cervical spine surgery. Tr. 630. Snyder reported constant, severe pain in his neck and back, aggravated by prolonged sitting, standing, walking, lifting, or moving his neck. Tr. 630. Snyder said that pain radiated down his left arm and he experienced left-arm numbness and tingling. Tr. 630. He had pain "off and on" in his knees for 10 years. Tr. 640. Snyder indicated that he could sit for 30 minutes, stand for five minutes, and walk two miles. Tr. 631. He could lift up to 10 pounds and bending was painful. Tr. 631. He performed

5

limited light housework, laundry, and grocery shopping; grooming activities; used his hands for gross and fine motor tasks; and drove on a limited basis. Tr. 631. He was not at that time taking any medications. Tr. 631.

Dr. Onamusi observed that Snyder walked with a normal gait, was able to walk on heels and toes, and was able to squat "only 50% of the way down." Tr. 632. He had mild to moderate diffuse tenderness to palpation along his paracervical and paralumbar muscles. Tr. 632. A straight leg-raising test was negative.[4] Tr. 632. Snyder had a limited range of motion in his cervical and lumbar spine and mild to moderate diffuse tenderness to palpation along his paracervical and paraspinal muscles. Tr. 632. He had a full range of motion in his joints, "no definite tenderness to palpation," and he could reach forward, push, and pull with his arms. Tr. 627, 632. Snyder had decreased grip strength in his left hand, but could grip and grasp with both hands and perform fine coordination and manipulative tasks ("tie knots, do buttons, do shoelaces, pick up coins, hold pens, turn door handles, pull zippers and do fine fingering movements"). Tr. 632. Dr. Onamusi opined that Snyder could sit frequently, stand or walk on the "low end of frequently," "bend to a limited extent occasionally," climb steps occasionally, lift up to 15 pounds occasionally, and

---

[4]    In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, 33rd Edition, 2020, at 1871. Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id*.

use his "upper extremities for gross or fine motor tasks on the low end of frequently." Tr. 633.

In early August 2023, Snyder underwent a cervical disk arthroplasty at C5-C6. Tr. 762. He followed up two weeks later and reported "feeling very well with improvement of neck pain and upper extremity radiculopathy." Tr. 947. Snyder's exam showed a well-healed anterior neck incision, "full strength including a 5 out of 5 handgrip, resisted wrist extension, elbow flexion[,] and extension strength testing bilateral." Tr. 947. Snyder was "neurologically intact." Tr. 947. The doctor advised him to "advance activities including returning to work … as a dishwasher" and return in two months for a follow-up. Tr. 947.

In late September 2023, Snyder saw his primary care provider for treatment for boils. Tr. 959. He complained that four times in the month before the appointment, when lying down trying to sleep, his legs started twitching and pain shot up his spine. Tr. 959. He said that his "[ba]ck pain feels unchanged since surgery." Tr. 959. On exam, Snyder had cervical, thoracic, and lumbar spine tenderness. Tr. 959. His neck was supple but with a limited range of motion. Tr. 959. Snyder was prescribed medication. Tr. 960.

7

*State agency opinions*[5]

In May 2023, Bradley Lewis, MD, reviewed Snyder's record. Tr. 72–74. Regarding Snyder's physical residual functional capacity (RFC),[6] Dr. Lewis found that Snyder could stand, walk, and sit for about six hours in an eight-hour workday. Tr. 73. He could lift and carry "(including upward pulling)" 50 pounds occasionally and 25 pounds frequently. Tr. 73. Snyder could occasionally push and pull with his left arm; frequently climb ladders, ropes and scaffolds; and frequently stoop and crouch. Tr. 73–74. Dr. Lewis did not assess handling or fingering limitations.

In October 2023, Leon Hughes, MD, reviewed Snyder's record, including the August 2023 neck surgery, and assessed Snyder's RFC. Tr. 84–86. Dr. Hughes opined that Snyder could stand, walk, and sit for about six hours in an eight-hour workday. Tr. 84. He could lift and carry "(including upward pulling)" 20 pounds occasionally and 10 pounds frequently. Tr. 84. Snyder

---

[5]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[6]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

could occasionally push and pull with his left arm; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally stoop and crawl; and frequently kneel and crouch. Tr. 84. Snyder could frequently reach in front, laterally, and overhead; should avoid all exposure to hazards, including operating heavy machinery and being at unprotected heights; and should not drive commercially. Tr. 85. Dr. Hughes assessed no handling, fingering or feeling limitations. Tr. 85.

*Hearing testimony*

Snyder, who was represented by counsel, testified at the telephonic administrative hearing held in May 2024. Snyder testified that he experiences weakness in his left arm and hand, and that he can't lift his left arm above his head. Tr. 54 He experiences neck and back pain, which radiates down his arm and leg. Tr. 50, 55. Pain medication caused constipation or diarrhea, requiring him to use the bathroom six or seven times a day. Tr. 52–53.

Snyder said that he drives using his left hand, even though he is right-hand dominant and his left hand is "wors[e]" than his right. Tr. 44, 58. He can get in and out of the car, gas up the car, put air in a tire, check the oil, and wash the front windshield, although he could not "stretch to get … the middle part of the windshield." Tr. 59.

The ALJ discussed with the vocational expert Snyder's past work as a forklift driver. Tr. 60. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work

experience as Snyder could perform Snyder's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 60–62. The vocational expert answered that such an individual could not perform Snyder's past work but could perform the following jobs: tester, routing clerk, and sorter. Tr. 61–62. The ALJ asked the vocational expert whether her answer would change if the individual would miss two or more days of work a month and be off-task more than 15 percent of the workday. Tr. 63. The vocational expert answered that there would be no work such an individual could perform. Tr. 63.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.
>
> 2. The claimant has not engaged in substantial gainful activity since July 14, 2022, the alleged onset date (20 CFR 404.1571 *et seq*.).
>
> 3. The claimant has the following severe impairments: Chron's disease; ulcerative colitis; cervical and lumbar osteoarthritis; disc degeneration of the cervical and lumbosacral regions; spinal stenosis, status-post cervical discectomy; and hidradenitis suppurativa (boils) (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: he can tolerate lifting/carrying 20 pounds occasionally, 15 pounds frequently, standing/walking 4 hours out of an 8-hour day, sitting 6 hours, occasionally climbing ramps and stairs, occasionally balancing, stooping, kneeling, crouching, and crawling; he must avoid hazards, including heavy machinery, moving machinery, and unprotected heights; he must avoid climbing ladders, ropes, and scaffolds; he must avoid commercial driving; he can frequently reach in all directions; and he would otherwise be off task 5% of the workday.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was … 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from July 14, 2022, through the date of this decision (20 CFR 404.1520(g)).

Tr. 19–30.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

           disabled. If not, the ALJ proceeds to the next step.

    5.    Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

    A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Throughout his brief, Snyder bundles separate arguments and presents them as one. *See, e.g.,* Doc. 11, at 11, 15. Ten times he references the "accurate and logical bridge" doctrine, including when challenging: limitations in the ALJ's RFC finding; limitations *not* in the ALJ's RFC finding; the ALJ's evaluation of opinion evidence; and in reference to Social Security Ruling 85-15, 1985 WL 56857, which addresses the Medical-Vocational Rules. *Id.* at 10–

14

20. I untangle Snyder's arguments into discrete parts and discuss them below, sometimes out of the order that Snyder presented them.

    *1. The ALJ did not err by relying on the absence of records after September 2023, and the finding that Snyder improved after surgery is supported by substantial evidence*

Snyder challenges the ALJ's finding that he improved after surgery. Doc. 11, at 15. To recap: Snyder had cervical spine surgery in early August 2023; reported and showed improvement at the two-week follow-up appointment; and in late September complained to his primary care provider that he experienced back pain. Tr. 25, 762, 947, 959. After discussing the evidence in the record, Tr. 23–25, the ALJ evaluated Snyder's reports of symptoms and concluded that they were not entirely consistent with the evidence. Tr. 25. The ALJ explained:

> For instance, at the hearing, the claimant testified that he experiences weakness and pain in his left arm and hand, he cannot lift his left arm above his head, and he experiences neck and back pain, which radiates throughout his whole upper body. In October of 2022, an examination showed a normal range of motion, both generally and in the cervical back, a supple neck, and no weakness or problematic upper motor neuron signs. (2F/37). However, by January of 2023, an examination showed some abnormalities. There was tenderness to palpation in the left paraspinal musculature and trapezius muscle, the claimant's hands were sensitive to light touch yet cold, and he exhibited weakness, graded 4/5, in his left-sided grip, elbow flexion, and shoulder abduction, compared to 5/5 on the right side. (9F/12-13). Due to these symptoms, the claimant underwent a cervical disk arthroplasty at C5-C6. (7F/14). Afterwards, [Snyder] reported improvement of neck pain and upper extremity radiculopathy, and upon

15

> examination, he maintained full strength, including 5/5 handgrip, resisted wrist extension, elbow flexion and extension bilaterally, and he was fully sensate without swelling. (9F/26). On September 26, 2023, the claimant complained of back pain, and an examination showed cervical, thoracic, and lumbar spine tenderness. (10F/1). However, after the fall of 2023, no other objective evidence appears in the medical record to corroborate the claimant's testimony that his neck surgery was only temporarily effective in managing his pain and weakness. The evidence, mentioned here, suggests that the claimant's symptoms, including weakness, restricted range of motion, and pain are not as disabling as he alleged. Even so, the undersigned has accounted for these symptoms by limiting the claimant to work [as described in the RFC].

Tr. 26. Snyder alleges that the ALJ's finding that his condition improved "is unsupported by substantial evidence." Doc. 11, at 15. But the ALJ cited Snyder's cervical spine surgery and subsequent improvement. Tr. 26. This is substantial evidence to support the ALJ's finding that Snyder's cervical spine impairment improved after surgery.

Snyder concedes that there was no evidence in the record after the September 2023 treatment note. Doc. 11, at 15. But he disagrees with the ALJ's conclusion drawn from it. Snyder contends that "there is no evidence contradicting the most recent findings. The absence of evidence does not equate to substantial evidence." *Id.*, at 15–16. First, the September 2023 note showed that Snyder reported "back pain" and had cervical, thoracic, and lumbar spine tenderness. Tr. 959. These findings don't undercut the initial post-surgical findings showing that Snyder's radiculopathy symptoms improved and that he

regained full strength in his upper extremities. Tr. 947. Moreover, "[i]t is illogical to require that the ALJ cite to evidence that does not exist." *See Meyer v. Comm'r of Soc. Sec.*, No. 1:12-cv-822, 2013 WL 6795606, at *5 (S.D. Ohio Dec. 20, 2013), *report and recommendation adopted*, 2014 WL 221947 (S.D. Ohio Jan. 21, 2014). This is especially so where, as here, Snyder, not the ALJ, has the burden to provide evidence to show that he is disabled. 20 C.F.R. § 404.1512(a). And "[u]nder [the] regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2.

In any event, Snyder has waived any argument related to the absence of post-September 2023 records and the conclusion that the ALJ drew from it. At the May 2024 hearing, the ALJ asked Snyder's attorney if the record was complete. Tr. 38. The attorney said that it was not, explaining that "[Snyder] had some relevant treatment from Orthopedic Institute of Ohio. He's now getting problems with his lower back." Tr. 38. The attorney had requested but had not received these and other records relating to Snyder's boils. Tr. 38. The attorney stated, "I don't know if you want this" and discussed records he had not received about Snyder's boils, and again said that "if you want me to request that record I can. I've not requested that." Tr. 39. The following conversation ensued:

> ALJ: [Y]ou can, if you request them and they come in we'll receive them. These records from the

Orthopedic Institute of Ohio, are these going to be continuing treatment because I do also see throughout the record the issues with the back.

ATTY: Yes.

ALJ: But I'm happy to—

ATTY: Yeah, I mean—

ALJ: —give you the window of time that you need.

ATTY: I mean, Judge, I mean we can certainly just submit them when we get them. I mean the reality is he's got pain in his cervical spine after the surgery in his lower back. He hasn't had his—he's got Medicaid so they got to do the physical therapy to get the MRI so there's not an MRI on his lower back.

ALJ: Mm-hmm.

ATTY: It's just going to show the pain and problems but it is a continuation. If you want to close—I mean there's 1600 pages of record. If you want close we can and if I get them I can send them in, whatever the court would like.

ALJ: We can—

ATTY: There's nothing, there's no injections, no surgeries, no MRIs from OIO in the records we requested. It's just him getting treatment to try to get an MRI.

ALJ: Okay, okay, all right. So then what we'll do then is we'll, if you all think there's no newer additional material evidence going to be in those records then I'll receive them if they come in, if not we won't hold the case in advance. Okay?

ATTY: Sounds good.

Tr. 39–40.

"The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991). This doctrine "is a branch of waiver by which the courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside." *Id.* at 61. The invited error doctrine has been applied to administrative proceedings, *see E.L. ex rel. Lorsson v. Chapel Hill–Carrboro Bd. of Educ.*, 773 F.3d 509, 516 (4th Cir. 2014), *St. Anthony Hosp. v. Dept. of H.H.S*, 309 F.3d 680, 696 (10th Cir. 2002), *Johnson v. I.N.S.*, 971 F.2d 340, 343–44 (9th Cir. 1992), including social security disability appeals, *see Dowling v. Comm'r of Soc. Sec.*, No. 1:16-cv-2180, 2017 WL 2417077, at *9 (N.D. Ohio May 18, 2017) (applying the invited error doctrine when an attorney told the ALJ at the hearing that the evidence didn't support a finding that the claimant satisfied Listing 12.05 but argued on appeal that the ALJ erred by not considering Listing 12.05), *report and recommendation adopted*, 2017 WL 2416992 (N.D. Ohio June 3, 2017).

Here, Snyder's attorney told the ALJ that the post-September 2023 records were not material to his disability case and he declined the ALJ's invitation to hold the record open to wait for that evidence. Tr. 39–40. Snyder cannot now complain that the absence of post-surgical or lower back evidence in the record was the ALJ fault, or that the ALJ was not permitted to rely on the absence of evidence. *See* 20 C.F.R. § 404.1512(a) (the claimant, not the

Agency, has the burden to provide evidence to demonstrate disability). The ALJ found that there was no record evidence to corroborate Snyder's testimony that his surgery was "only temporarily effective," Tr. 26, and her finding is supported by substantial evidence.

### 2. The ALJ is not required to prove a negative

Snyder argues that "the ALJ erred when failing to build and accurate and logical bridge from the evidence to the" RFC findings regarding Snyder's ability to stand and walk and his off-task behavior. Doc. 11, at 11. In doing so, Snyder makes two separate arguments. He argues that the ALJ failed to explain why she included in the RFC the specific limitations on standing, walking, and off-task behavior. *Id*. But he also argues that the ALJ failed to explain *why she did not include different* limitations on standing, walking, and off-task behavior. *See id*. (the ALJ "does not explain why Plaintiff could stand/walk 4 hours rather than 2 hours, 3 hours, or 5 hours out of an 8-hour day" or "why Plaintiff would be off task 5% of the workday rather than 0%, 10%, 15%, or a greater amount of time during the workday."); Doc. 14, at 1.

In essence, Snyder expects the ALJ to prove a negative. He cites no legal authority stating that an ALJ must articulate reasons for *not* including a variety of hypothetical limitations when assessing the RFC. While true that an ALJ must explain, for instance, why she would reject certain limitations that may have been offered in a medical opinion, *see* 20 C.F.R. § 416.920c(a), Snyder's argument here is untethered to any opinion evidence. No medical

20

provider opined that Snyder could stand and walk for less than four hours a day or would exhibit off-task behavior. Simply put, Snyder attempts to create a new articulation standard. His arguments on this point, which permeate his entire brief, fail.

### 3. The ALJ's RFC is supported by substantial evidence

Snyder argues that the ALJ's RFC is not supported by substantial evidence. Doc. 11, at 11, 15–24. In doing so, Snyder challenges the ALJ's evaluation of the opinion evidence, Snyder's statements regarding his symptoms, and whether the ALJ sufficiently explained her findings. *Id*.

Snyder's challenge to the ALJ's evaluation of the portion of Dr. Onamusi's opinion regarding lifting and carrying limitations, Doc. 11, at 21, fails to the extent it is based on Snyder's argument that the ALJ erred when she found that Snyder's symptoms improved after surgery. As explained above, Snyder's challenge to this issue fails and is waived. Snyder's challenge to the ALJ's evaluation of Dr. Onamusi's opinion regarding arm use beyond the issue of improvement after surgery, *id*., also fails. The ALJ found that Dr. Onamusi's strength findings on exam did not support Dr. Onamusi's limitations regarding Snyder's "limitations using his upper extremities for gross or fine motor tasks." Tr. 27. The ALJ explained:

> While [Dr. Onamusi] found that the claimant's grip strength was decreased in his left hand, the claimant was still able to grip and grasp with both hands, he could use his hands for fine coordination, and he could reach forward and push/pull with his upper extremities. (4F/9). Such evidence supports

21

> limiting the claimant to occasionally lifting/carrying
> 20 pounds, rather than just 15 pounds, and it does
> not support any limitations regarding gross or fine
> motor tasks.

Tr. 27; *see also* Tr. 625–29, 632 (Dr. Onamusi's exam findings and conclusions).

The ALJ then described how, after his surgery, Snyder retained "full strength,

5/5, in his handgrip, and with resisted wrist extension and elbow flexion and

extension bilaterally," which the ALJ also found inconsistent with the

limitations Dr. Onamusi assessed. Tr. 27. Thus, the ALJ provided an

explanation as to why she rejected Dr. Onamusi's opinion, contrary to Snyder's

assertion, Doc. 11, at 21, and the ALJ's explanation is supported by substantial

evidence.

Snyder argues that when the ALJ weighed Dr. Onamusi's opinion, she

improperly "interpreted … raw medical data." Doc. 11, at 22. This is not so. As

explained by another court in this Circuit:

> "Raw medical data," however, generally includes
> testing such as x-rays, *Rudd v. Comm'r of Soc. Sec.*,
> 531 F. App'x 719, 727 (6th Cir. 2013), MRI images,
> *Holland v. Comm'r of Soc. Sec.*, No. 4:13-CV-10295,
> 2014 WL 1118521, at *7 (E.D. Mich. Mar. 20, 2014)
> or an EMG, *Kidder v. Comm'r of Soc. Sec.*, No. 1:18-
> CV-661, 2020 WL 1080413, at *5 (S.D. Ohio Mar. 6,
> 2020), *report and recommendation adopted*, No.
> 1:18-CV-661, 2020 WL 5201080 (S.D. Ohio Sept. 1,
> 2020). Treatment notes or reports from medical
> professionals following various testing, on the other
> hand, are not considered raw medical data beyond
> the ALJ's expertise.

*Lonnie F. v. Comm'r of Soc. Sec.*, No. 2:23-cv-890, 2024 WL 3506946, at *3 (S.D.

Ohio July 23, 2024) ("an ALJ does not improperly 'interpret raw medical data'

simply by evaluating the medical evidence …. '[f]ar from prohibiting ALJs from directly evaluating medical evidence, the law requires it.'") (collecting cases). Snyder's complaint that the ALJ "played doctor" when he evaluated Dr. Onamusi's opinion, Doc. 11, at 23, likewise fails. As the Commissioner says, "what [Snyder] characterizes as 'playing doctor,' the Sixth Circuit has consistently characterized as 'weighing the evidence.'"[7] Doc. 13, at 14 (citing *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (explaining that "[a]n ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding"), in turn citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)).

Next, Snyder argues that the ALJ erred when she evaluated Snyder's reports of symptoms. Doc. 11, at 22. He contends that the ALJ only relied on objective findings, and asserts that an ALJ may not rely only on objective findings to discount a claimant's reports of symptoms. *Id.* (citing 20 C.F.R. § 404.1529(c)(2)). But the ALJ also relied on Snyder's treatment, Tr. 26, which is a separate basis on which an ALJ may rely when evaluating a claimant's reports of symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(v). Snyder lists what an ALJ must consider when evaluating a claimant's symptoms, Doc. 11, at 22, but

---

[7]     Indeed, the report and recommendation that Snyder extensively cites for his "played doctor" argument was rejected by the district court *before Snyder filed his brief*. Doc. 11, at 23 (citing *Nichols v. Comm'r of Soc. Sec.*, No. 1:23-cv-2063, 2024 WL 3387289 (N.D. Ohio June 21, 2024), *report and recommendation rejected*, 2025 WL 2029765 (N.D. Ohio July 21, 2025).

a duty to "consider" the evidence is different than a duty to "discuss" the evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)). And Snyder has not shown that the ALJ failed to consider other evidence.

Snyder argues that the ALJ "failed to explain how the evidence supports the ability to perform standing/walking for a total of 4 hours of an 8-hour workday." Doc. 11, at 15. But the ALJ wrote:

> Dr. Onamusi opined that the claimant could sit frequently, stand, or walk on the low end of frequently, [etc.] …. The undersigned finds this opinion somewhat persuasive. Dr. Onamusi's opinion that the claimant would have difficulty sitting, standing, walking, bending, and climbing steps is supported by his examination. He found that although the claimant's gait was normal, he had mild to moderate diffuse tenderness to palpation along the paralumbar muscles, and he could only squat 50% of the way down. (4F/9). This portion of Dr. Onamusi's opinion is consistent with the remainder of the medical evidence.

Tr. 27. The ALJ's finding that Snyder can stand and walk for four hours is consistent with Dr. Onamusi's opinion that Snyder can stand and walk on the "low end of frequently." Tr. 27, 633. This is substantial evidence that supports the ALJ's standing and walking limitations.

Snyder complains that the ALJ ignored his testimony about his lumbar spine impairment, Doc. 11, at 17, but the ALJ mentioned that Snyder testified

24

that he experiences back pain, Tr. 23. The ALJ discussed Snyder's lumbar impairment when she evaluated the opinion evidence. Tr. 27 (discussing the opinions of Dr. Onamusi and the state agency reviewers). In fact, the ALJ assessed greater restrictions on Snyder's ability to stand and walk than the state agency reviewers had. In rejecting the state agency reviewers' opinions, including that Snyder could stand and walk for six hours in an eight-hour day, the ALJ explained:

> The undersigned concludes that these findings are unpersuasive. While some of them may have been supported by the evidence in the file at the time of Dr. Lewis's review, they are not consistent with the complete evidence in the file. In August of 2023, after he underwent neck surgery, the claimant exhibited full strength in his upper extremities. (9F/26). *However, just one month later, the claimant complained of back pain*, and an examination revealed cervical, thoracic, *and lumbar spine tenderness.* (10F/1). Such evidence is not consistent with Dr. Lewis's overly lenient limitations.

Tr. 27 (emphasis added). In other words, the state agency reviewers considered Snyder's lumber spine impairment, Tr. 72–73, 83; found that Snyder could stand and walk for six hours a day, *id*.; and the ALJ evaluated these opinions and further limited Snyder based in part on his lumbar impairment, Tr. 27. So the ALJ considered Snyder's lumbar impairment and accounted for his associated symptoms in the RFC. *See also Laney v. Comm'r of Soc. Sec*., No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions" in the RFC than were suggested in the state agency reviewers' opinions) (citations omitted); *Ferris v.*

*Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017).

Snyder references "[t]he need for position changes" and cites his testimony at the administrative hearing in which he said that after sitting for 15 minutes, his legs go numb and he walks around "to get the feeling back." Doc. 11, at 17–18 (citing Tr. 58). He argues that remand is required "for proper explanation for the exclusion of the need to walk after being seated." *Id.* at 18. There are number of problems with this argument. First, Snyder did not include any of his testimony in the *Facts* section of his brief, as is required to rely on that testimony to support his claim. *See* Doc. 7, at 4 ("The Court will not consider facts referenced in a party's argument unless those facts have been set out in the *Facts* section of the party's brief."). Next, the ALJ's failure to mention one statement, particularly in a 1,600-page record, Tr. 39, is not error. *See, e.g., Dickey-Williams v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 792, 807 (E.D. Mich. 2013) ("[T]he fact an ALJ did not specifically state every piece of evidence or every symptom is not an error"). Finally, there is no opinion evidence stating that Snyder must change positions. Snyder has not cited legal authority that requires an ALJ to explain why he did not include in the RFC a limitation that no medical provider assessed. The ALJ considered Snyder's

26

lower back impairment, Tr. 20, 22, 24–28, and Snyder has not shown that the ALJ erred.[8]

Snyder complains that "the ALJ failed to provide any explanation for the finding regarding time off task and why the evidence supports the specific 5% of the workday where Plaintiff would be off task." Doc. 11, at 18. He submits that the ALJ also "failed to explain what symptoms or impairments would cause" the off-task limitation. *Id*. But the ALJ assessed the off-task limitation "due to [Snyder's] pain." Tr. 26. So she explained what symptom caused the off-task limitation. Snyder cites a case in which the court remanded because the percentage of time the ALJ assessed the claimant to be off-task "appears to be nothing more than an arbitrary number slightly below the 'Unemployability' threshold identified by the [vocational expert].'" Doc. 11, at 19 (citing *Farley v. Comm'r of Soc. Sec.*, 2020 WL 772330, *6 (S.D. Ohio Feb. 18, 2020), *report and recommendation adopted*, 2020 WL 1042383 (S.D. Ohio Mar. 4, 2020)). But in *Farley*, a doctor opined that the claimant would need unscheduled breaks, and the court's ruling was tied to the ALJ's evaluation of that opinion. *Id*. Here, no medical opinion in the record assessed Snyder with off-task limitations. Snyder has not shown that the ALJ erred. *See Tammy W. v. Comm'r of Soc. Sec. Admin.*, No. 2:23-cv-1196, 2024 WL 4284251, at *6 (S.D. Ohio Sept. 25, 2024) ("no medical opinion found that Plaintiff required an off-task limitation

---

[8]     As explained above, Snyder chose not to pursue updating the record with treatment notes regarding his lower back impairment. Tr. 39–40.

whatsoever, meaning the ALJ's off-task limitation was a further limitation than found within the record," and that, as a result, the plaintiff's argument was "not well-taken").

Snyder claims that the vocational expert testified that being off-task "is not really allowed," so the ALJ's "step five finding is unsupported by ambiguous testimony." Doc. 11, at 19. But the vocational expert continued her answer as follows:

> But most people can produce an average amount with average quality and thus maintain employment if they're not off task 15 percent of the time or more.

Tr. 63. The vocational expert's testimony does not doom the ALJ's step five finding.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: February 10, 2026

 /s/ James E. Grimes Jr.

James E. Grimes Jr.

U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).